Solomon KENDRICK, Appellant,

v.

FOX TELEVISION, et al., Appellees.

No. 92–CV–177.

District of Columbia Court of Appeals.

Argued March 10, 1995.
Decided June 1, 1995.

Philip M. Musolino, Washington, DC, for appellant.

Martin B. White, Asst. Corp. Counsel, with whom Vanessa Ruiz, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for the District of Columbia.

Kevin T. Baine, with whom William E. McDaniels, Victoria L. Radd, and Nicole K. Seligman, Washington, DC, were on the brief for appellees Fox Television Stations, Inc., WTTG, Nat. Broadcasting Co., Inc., and NBC Subsidiary (WRC–TV), Inc.

Before WAGNER, Chief Judge, FERREN, Associate Judge, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

Appellant, Solomon Kendrick, appeals the trial court's order granting summary judgment for appellees, the District of Columbia and Deputy Chief of Police Jimmy L. Wilson (the "District defendants") and Fox Television Stations, Inc., WTTG, National Broadcasting Company, Inc., and NBC Subsidiary (WRC–TV), Inc. (the "media defendants"). Kendrick contends the trial court erred in ruling that (1) the District defendants had absolute immunity from suit, and that (2) the media defendants were not negligent as a matter of law. We affirm.

### I.

**Operation Recovery**

Appellant Kendrick, an executive assistant to the Deputy Superintendent of the District of Columbia public schools, owns a rent-controlled apartment building called Capitol Terrace. Located next to Woodson Junior High School, Capitol Terrace has been the site of illegal drug activities for several years. Since late 1988, the community and the authorities have organized to fight against drug dealing and crack dens at Capitol Terrace, and the press has covered their efforts.[1]

On February 6, 1989, the government carried out "Operation Recovery," a multi-agency, two phase operation comprised of a drug raid and housing inspections at Capitol Terrace. During this operation, housing inspectors and fire marshals inspected 49 units, found 833 routine code violations and 80 emergency violations, and assessed $6,350 in civil fines. The police, however, did not recover any drugs or make any drug related arrests.

**Channel 4 Reports**

On February 3, 1989, three days before "Operation Recovery," National Broadcasting Company, Inc. and its local affiliate, WRC–TV (together "Channel 4") received news of the planned raid,[2] and Channel 4 reporter Pat Lawson Muse was assigned to cover the story. Muse arrived at Capitol Terrace at 10 a.m. on February 6, while Operation Recovery was in process. She interviewed Capitol Terrace tenants, who told her they were afraid to identify themselves because Kendrick had threatened to evict them if they complained about conditions in the building. Muse also interviewed Deputy Chief Wilson at the scene. Wilson told Muse that the police were looking into allegations that Kendrick might have tipped off drug dealers about the raid. Wilson added that he would be seeking a warrant for Kendrick's arrest for obstruction of justice.

After interviewing Wilson, Muse tried to locate Kendrick for comment. She went to his office but was unable to find him. She attempted without success to reach him by telephone.[3] Later in the day, Muse called Wilson and reconfirmed that the police were still looking into allegations that Kendrick had tipped off drug dealers at Capitol Terrace.

On the evening of February 6, 1989, Channel 4 ran news accounts of Operation Recovery on its 5:00 p.m. and 6:00 p.m. broadcasts. Channel 4 reported that tenants "say that

---

1. On January 26, 1989, The Washington Post reported that:

   Parents [of Woodson Junior High students] blame most of the trouble [of drug activity] on the Capital Terrace Apartments, which police and property owners acknowledge are used as dens to peddle crack. The 83 unit complex ... houses low income adults, some of whom sublet their rooms to drug dealers. Turf and gun battles have followed.

2. The record does not show how Channel 4 learned this information.

3. According to her affidavit, Muse tried to find Kendrick's home number, but it was unlisted. She called the D.C. School Board and obtained an office number for Kendrick. Muse called this number several times on the afternoon of February 6, 1989, but no one answered. Muse discovered the following day that she had been given the wrong number.

the landlord frequently intimidates them and threatens to throw them out if they make trouble" and that "Deputy Chief Wilson says he is looking into allegations that Dr. Kendrick may have tipped off the dealers to today's surprise raid.... We have been unable to reach Kendrick."[4]

The next day, February 7, Muse reached Kendrick by telephone and spoke with him at length. During this conversation, Kendrick acknowledged that he had attended a meeting with certain city officials where they had discussed housing inspections of Capitol Terrace, but he denied knowing about the drug raid or tipping off drug dealers. Kendrick initially agreed to a television interview but later changed his mind.

After going back to Capitol Terrace to update her information and then speaking with Deputy Chief Wilson again, Muse reported Kendrick's statements on the February 7 evening news:

> On the advice of his attorney, Dr. Kendrick would not go on camera today, but did tell us there are no major violations [at Capitol Terrace] ... [a]nd he claims [drug] trafficking here had gotten out of hand because police have done little to help him bring it under control. Police dispute that.... [W]hile Wilson says he has information leading him to believe Kendrick may have tipped off dealers to yesterday's surprise inspection, Kendrick says he didn't even know police would be there, that police themselves must have tipped off the dealers. Kendrick also disputes tenant claims that he collects rent money from dealers, saying that he has no way of knowing where a person's rent money comes from....

> The landlord says he last renovated the[ ] building in 1982, but claims that in recent years he's been unable to get the city to help him get loans to fix things up. He says he's not an absentee landlord, but a victim of tenants who are sympathetic to

dealers that neither he nor the police can control.

Thereafter, on February 11, Channel 4 covered an anti-drug rally at the Woodson Junior High School where Mayor Barry and Councilmember Crawford discussed problems at Capitol Terrace apartments. On February 14, Channel 4 broadcast an interview with a flooring contractor at Capitol Terrace who described how drug dealers controlled the complex. As part of this broadcast, Channel 4 reported that "Kendrick says that he has cooperated in the fight against the dealers, even letting police set up an observation post in an apartment."

## Channel 5 Reports

Fox Television Stations and WTTG (together "Channel 5") had been investigating the controversy at Capitol Terrace for some time before February 6, 1989, as part of the nightly news show entitled "City Under Siege," produced by Bruce Becker, which focused on drug related issues in the District of Columbia. Field producer Jackie Bensen had visited the apartment complex and interviewed tenants who had told her of the same threats that tenants had told Muse about on February 6. On January 26 and February 3, "City Under Siege" ran pieces on the mounting concern of parents over drug related violence at Capitol Terrace.

Bensen first learned of Operation Recovery on February 7, when she read a story that had come over the Associated Press (AP) wire at 10 p.m. on the night of February 6. After reading this story, Bensen went to Capitol Terrace, where she talked with housing inspectors and neighborhood leaders. Although Bensen tried to reach Kendrick twice by telephone at his office and left her name and number the second time, Kendrick did not return her call.

In the February 7 broadcast of "City Under Siege," Channel 5 reported that residents had said "Kendrick had threatened to evict anyone who complained to police about [housing] violations or the drug problem,"[5]

---

4. Channel 4 did not report that Wilson was seeking an arrest warrant for Kendrick for obstruction of justice. Muse stated in her affidavit that she did not want to report this fact until a warrant had, in fact, been issued.

5. This statement was based on the AP report and on Bensen's interviews with the residents of Capitol Terrace.

and that "police are looking into allegations that Kendrick may have tipped off drug dealers about a raid on the apartments." [6]

On February 11, Channel 5 broadcast a followup story on Capitol Terrace that included an interview with Wilson, who said that the police were still trying to determine "what information was revealed ... and whether or not there was any criminal liability on [Kendrick's] part." Channel 5 tried, but was not able, to reach Kendrick or his attorney for comment before the broadcast on February 11. Channel 5, however, did include in the broadcast an excerpt from a letter from Kendrick's attorney stating that, according to Kendrick, the allegations were "slanderous and an outrageous example of irresponsible and destructive journalism." Bensen was able to reach Kendrick for a telephone interview on February 13, and Kendrick's comments were accurately reported in Channel 5's February 13 news broadcast.

### Proceedings in Superior Court

On March 9, 1990, Kendrick sued the District and Wilson for defamation and for violations of constitutional rights under 42 U.S.C. § 1983 (1988). He sued the media defendants for "Defamation; Libel; Slander; False Light; Invasion of Privacy." Specifically, Kendrick challenged four statements by Channel 4 and two statements by Channel 5 to the effect that (1) the police were looking into allegations that Kendrick had tipped off drug dealers about the raid, and that (2) Capitol Terrace tenants had said Kendrick had threatened them with eviction if they were to report any housing code violations. These statements also reflected the alleged liability of Wilson, and thus of the District (via respondent superior), for defamation.

On October 25, 1991, the trial judge granted the District and Wilson summary judgment on Kendrick's defamation claim, con-

cluding that, in making the statements, Wilson acted within the "outer perimeters" of his official duties and that this amounted to discretionary—as opposed to ministerial—official action, thereby warranting absolute immunity from suit.[7] Subsequently, on November 11, 1991, the judge also granted the media defendants summary judgment, concluding that, even assuming Kendrick was a private figure, he had failed to create a genuine issue of material fact as to whether the media defendants acted negligently in their reporting. Kendrick appeals both summary judgment orders.

## II.

### Standard of Review

■ This court reviews summary judgment *de novo.* *See Galloway v. Safeway Stores, Inc.,* 632 A.2d 736, 738 (D.C.1993). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See id.* (citations omitted). "[A] motion for summary judgment is properly granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof." *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979). The moving party has the burden of "demonstrating the absence of material disputed issues and the right to judgment as a matter of law." *Galloway,* 632 A.2d at 738 (citation omitted). Once the movant has made such a prima facie showing, the nonmoving party has the burden of producing evidence that shows there is "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Nader,* 408 A.2d at 48 (citation omitted). Conclusory allega-

---

**6.** Bensen obtained this statement directly from the AP. Before broadcasting the statement in "City Under Seige," however, she called Wilson to verify that the police were looking into allegations that Kendrick had tipped off drug dealers about the raid.

**7.** The judge also awarded the District and Wilson summary judgment on Kendrick's 42 U.S.C.

§ 1983 claims for defamation and conspiracy to deny due process. The judge, however, did not reach Kendrick's 42 U.S.C. § 1983 claim based on lack of training. This claim was subsequently dismissed by a consent order docketed on January 31, 1992. Because Kendrick does not appeal summary judgment as to his federal claims, we do not address them.

tions by the nonmoving party are not sufficient for that purpose. *See Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 198 (D.C.1991).

■ As an initial matter, we note that in a defamation case the plaintiff has the burden of proving that the challenged statements are both false and defamatory. *See Vereen v. Clayborne,* 623 A.2d 1190, 1194–95 (D.C.1993) (citing *Harrison v. Washington Post Co.,* 391 A.2d 781, 783 (D.C.1978)). A defamatory statement is one "that tends to injure the plaintiff in his [or her] trade, profession or community standing, or lower him [or her] in the estimation of the community." *Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1993). In this case, for purposes of their summary judgment motions, neither the District defendants nor the media defendants have contested Kendrick's claims on the ground that the statements at issue were not false or defamatory. In granting the summary judgment motions, therefore, the trial court assumed that each challenged statement was both false and capable of a defamatory interpretation. Consequently, for purposes of this appeal, we assume the same.

### Summary Judgment for the District Defendants

■ In *District of Columbia v. Thompson,* 570 A.2d 277 (D.C.1990) (*Thompson I* ), this court has prescribed the standards for determining whether allegedly defamatory statements by a District official are immune from

suit.[8] The court must conduct a two-part inquiry to determine whether the official's statement (1) falls within the "outer perimeter" of the official's duties, and (2) involves "discretionary" rather than "ministerial" activity. *Id.* at 294–97. If both conditions are satisfied, absolute immunity will be established. The reason why absolute immunity is available for discretionary official acts is clear: to ensure that when public officials exercise discretion in carrying out their duties, concern about tort liability will not inhibit the "fearless, vigorous and effective administration of policies of government." *Id.* at 295 (quoting *Barr v. Matteo,* 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959)).

■ As to the first criterion, we have said that actions which "have more or less connection with the general matters committed by law to [the official's] control or supervision" qualify as falling within the "outer perimeters" of the official's duties. *Moss,* 580 A.2d at 1020.[9] In this case, there can be no question that Deputy Chief Wilson's communications with reporters about Operation Recovery were within the outer perimeters of his duties as Deputy Chief of Police for the Sixth District and as the highest ranking officer at the scene.[10] The fact that the planning documents for Operation Recovery show that another police officer was assigned responsibility for handling press inquiries generated by the operation can only be understood as an effort to assure police/press contact; it did not purport to be exclusive or

---

**8.** In *District of Columbia v. Thompson,* 593 A.2d 621 (D.C.1991) (*Thompson II* ), this court reheard *Thompson I,* 570 A.2d 277, and, upon reconsideration, held that the personnel provisions of the Comprehensive Merits Personnel Act, D.C.Code §§ 1–624.2 to –624.46 (1987), preempted the District employee's common law remedies for defamation (among other preempted claims) against her supervisor and the District. Accordingly, we reversed and ordered dismissal of the employee's defamation claims. In the meantime, in *Moss,* 580 A.2d at 1018 n. 12, this court noted that the petition for rehearing in *Thompson I* was pending and that, as a consequence, the discussion of immunity in that case could become moot. *Id.* The court then said: "We conclude, however, exercising our own judgment as a division, that the immunity analysis in *Thompson* is sound and that we would adopt it even if the *Thompson* opinion were vacated." *Id.* Accordingly, this court's analysis in

Part V of *Thompson I,* 570 A.2d at 291–98, is the law of this jurisdiction. *See Thompson II,* 593 A.2d at 624 n. 3.

**9.** Actions can fall within the outer perimeters of an official's duties even if they are not "expressly prescribed by statute or performed at the specific direction of a superior." *Moss,* 580 A.2d at 1020.

**10.** The District stresses that Police Department General Order No. 204.1, which spells out the policies regarding "Release of Information to the News Media," authorized Wilson to communicate with the press about the operation. The order authorizes "[o]lfficials in command of details assigned at the scene of a special event or emergency" to provide appropriate information to the news media.

in any way to preclude Wilson, as head of the operation, from communicating with the press in his official capacity.

The second *Thompson I* criterion for absolute immunity—*i.e.*, that the challenged official action be discretionary, not "ministerial"—creates a balancing test in which "society's concern to shield the particular government function at issue from the disruptive effects of civil litigation" is balanced against "the vindication of private injuries otherwise compensable at law." *Moss*, 580 A.2d at 1021; *see Thompson I*, 570 A.2d at 297.[11] This court in *Thompson I*, as adopted in *Moss*, see *supra* note 8, specified four factors for use in applying the balancing test:

> (1) the nature of plaintiff's injury, (2) the availability of alternative remedies, (3) the ability of the court to judge fault without unduly invading the executive function, and (4) the importance of protecting particular kinds of official acts.

*Id.* (citation omitted).

Applying the *Thompson I* factors to the facts in this case, we note that Kendrick presumably suffered some injury to his reputation, but his economic losses are either minor or highly speculative.[12] *See Beard*, 587 A.2d at 198. Kendrick's allegations of physical injury, moreover, are conclusory and unsupported by medical records or expert evidence.[13]

As to the second factor—the availability of alternative remedies—we note that Kendrick did not have an administrative remedy as an alternative to judicial action. *See Thompson I*, 570 A.2d at 297 (noting that Thompson had alternative administrative remedies through OEA and PERB); *see also* W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 132, at 1064 (5th ed. 1984) (describing "alternative remedies" as administrative remedies).[14]

The third *Thompson I* factor—concern about undue invasion of the executive function—cuts very much in favor of absolute immunity. If courts were to have responsibility for deciding whether the statements of police officials about ongoing investigations are false and defamatory, they would be second-guessing details of judgments police officials have to make in conducting sensitive and difficult investigations while those officials also are attempting to keep the public adequately informed. Court scrutiny of this difficult balance, where public safety issues are implicated, is likely to be overly intrusive, amounting to an invasion of the executive function that *Thompson I* indicates should be avoided.

Finally, the last factor—*i.e.*, the importance of protecting particular kinds of official acts—also militates in favor of concluding that Wilson's press activities were "discretionary." The public interest requires that police officials be free to comment about ongoing police activity on matters of public concern. Just as court scrutiny of official statements to the press could unduly interfere with judgments the police must make in investigating crime, such scrutiny, as already indicated in reference to the third *Thompson I* criterion, could also unduly interfere with the public's opportunity to know what is happening to police investigations.

In sum, three of the four *Thompson I* factors cut in favor of absolute immunity.

---

**11.** This court, in *Thompson I*, specified that the distinction between discretionary and ministerial functions "turns on whether imposition of liability would more likely encourage or inhibit conscientious, effective performance of the particular government function at issue." *Id.*, 570 A.2d at 296.

**12.** To show economic harm, Kendrick submitted (1) a letter from the District of Columbia Property Insurance Facility stating that his "seat on the Board [was] not be filled" because of "the problems featured in the news," and (2) a statement in his affidavit that he had been denied a job promotion after the challenged statements were aired.

**13.** Kendrick provided his own affidavit stating that he suffered tachycardia as a result of stress caused by the defamatory statements.

**14.** We note, however, that both television stations involved in this case provided Kendrick with at least a partial, informal remedy for his injury. After the initial news reports on February 6, the stations reported Kendrick's statements that he had cooperated with the police and that he had not tipped off drug dealers. In addition, Channel 4 offered Kendrick an opportunity to appear on the air (which he rejected).

Taken together, these factors clearly support the conclusion that Wilson's communications with the press comprised "discretionary" activity. Consequently, the trial court correctly determined that the District defendants—undertaking discretionary actions within the outer perimeter of official duties—had absolute immunity from suit and thus properly granted them summary judgment.

## Summary Judgment for the Media Defendants:

According to the case law, "a public figure may recover damages for defamation by showing that an allegedly defamatory statement about the plaintiff was made with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Foretich v. CBS, Inc.*, 619 A.2d 48, 59 (D.C.1993) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 297, 84 S.Ct. 710, 735, 11 L.Ed.2d 686 (1964)). On the other hand, "[t]he basic standard of care in the District of Columbia for media defamation of private individuals, so far as actual damages are involved . . . [is] that of negligence." *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980); *see also Vereen*, 623 A.2d at 1195 (applying a negligence standard to non-media defamation of private person).

In this case, the trial judge assumed for purposes of the litigation that Kendrick is a private figure [15] and granted summary judgment to the media defendants. The judge concluded as a matter of law that there was no evidence upon which a jury could base a finding that the media defendants had been negligent. Moreover, the judge concluded that, in light of the precautionary actions the reporters had taken in preparing and broadcasting their news stories, Kendrick had failed to proffer evidence tending to rebut the media defendants' prima facie showing

**15.** The trial judge, therefore, did not have to resolve whether (in the parlance of defamation litigation) Kendrick was a private figure, a public figure, or a limited purpose public figure. *See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 337, 345, 94 S.Ct. 2997, 3009–10, 41 L.Ed.2d 789 (1974); *Moss*, 580 A.2d at 1029–30.

**16.** Because the trial judge granted summary judgment to the media defendants on the issue of negligence, she did not have to decide whether

that their reporters had not been negligent in reporting the challenged statements.[16]

Kendrick challenges the court's ruling by arguing that the media defendants negligently (1) failed to contact Kendrick before airing the challenged statements by Deputy Chief Wilson, (2) ignored Wilson's lack of credibility reflected in previous news reports casting doubt on Wilson's veracity, and (3) failed to air Kendrick's responses to Wilson's statements in a timely fashion. Kendrick contends that these issues raise jury questions that could not be decided as a matter of law.

### A.

Before we can decide whether there is a genuine issue of material fact precluding summary judgment, we must decide the applicable standard of care—*i.e.*, the duty to Kendrick—for which the media defendants are legally accountable.

■ Aside from positing the negligence standard, the trial court did not discuss the standard of care. Because of our role in reviewing a summary judgment order *de novo*, we can—and must—decide the case by reference to the particular formulation of the standard of care that is applicable to this kind of situation. Kendrick suggests in his brief the applicability of Standardized Civil Jury Instructions for the District of Columbia (1985 Supp.) No. 17–2 (Defamation—Private Plaintiff/Media Defendant—Generally) (hereafter Instruction No. 17–2), which provides in relevant part:

> Before the plaintiff [INSERT NAME] may recover in this case, you must find that he/she has proven by a preponderance of the evidence that he/she was libeled (slandered) by the defendant and sustained actual injury as a result.

the media defendants' reporting reflected actual malice, a substantially higher standard for a plaintiff to meet. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). Moreover, she did not have to reach the question whether the media defendants' actions were protected by a common law privilege for reporting official actions in the District. *See Phillips*, 424 A.2d at 88.

Libel (slander) is the negligent publication of a false and defamatory statement about another. *Negligent publication is the unreasonable failure, under the circumstances, to take care that the statement made was true. The defendant must exercise the degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances.*

(Emphasis added.) [17] We generally confirmed this standard in *Moss* (while discussing malice in the context of a qualified privilege). We referred to ordinary negligence as "a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others," *id.*, 580 A.2d at 1025, *i.e.*, "a failure to make a reasonable investigation as to truth," *id.* at 1026. The media defendants have not questioned this negligence formulation. We apply it here, agreeing with the trial court that the case can properly be resolved by using the standard of care most favorable to Kendrick.

It is interesting to note that the media defendants have not suggested that a plaintiff must proffer expert testimony to establish the applicable standard of care or to permit a finding of negligence. Nor, on the other hand, has Kendrick suggested that the media defendants must proffer expert testimony to establish their right to judgment as a matter of law on a motion for summary judgment. In short, both parties implicitly agree that, in considering their respective burdens on the media defendants' motion for summary judgment, the court shall apply the substance of Instruction No. 17–2 to the facts proffered by each party, in order to determine whether there is any genuine issue of material fact that would permit a jury to find negligence, as so defined.[18]

**B.**

We turn to the question whether there are genuine issues of material fact and, if not, whether the media defendants are entitled to summary judgment as a matter of law. In support of their motion for summary judgment, the media defendants submitted sworn affidavits of the three journalists involved in this case—Muse from Channel 4, and Bensen and Becker from Channel 5—who detailed the facts outlined in Part I above, emphasizing their efforts to confirm Deputy Chief Wilson's statements, to obtain Kendrick's comments before the February 6 newscast, and to give Kendrick an opportunity to respond to Wilson the next day and thereafter on the air through reported statements and in person. The journalists then added conclusory statements that, in reporting Wilson's statements, they had followed the standards of care customarily applicable to journalists.[19]

17. The balance of the instruction explains what is meant by "publication of a statement" and by a "defamatory statement."

18. It is important to emphasize that we are taking no position on the question whether, in this context, expert testimony would be required if a party raised the point. We note, however, that there is nothing to prevent a person who acted in or observed the transactions or occurrences at issue from testifying as an expert on the applicable standard of care. *See Adkins v. Morton*, 494 A.2d 652, 656–57 (D.C.1985) (holding that professional whose opinions about lawsuit are acquired as "an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit" may provide expert testimony without certification as expert under Super.Ct.Civ.R. 26(b)(4)).

19. Muse averred that it was "customary for reporters to rely upon, and report, information provided by police officials about the conduct of police activities." She went on to state:

At all times during the course of my reporting I acted in good faith and conducted myself according to standards of care that I have learned in the course of my career as a journalist. I relied upon individuals who were describing their own living conditions, upon community leaders who were in a position to state the community's concerns, upon school officials, housing officials and police officials who spoke with authority about matters within the scope of their responsibility. I made every reasonable effort to contact Mr. Kendrick for comment, and when I was successful, to include his comments in a report that evening. At no time did I have any doubt about the accuracy of the reports that were broadcast on Channel 4 on February 6 and 7, and at no time did I have any ill will toward Mr. Kendrick.

Bensen and Becker made similar averments, concluding that, in reporting the affairs at Capitol Terrace, they had observed the standards of care that are customarily observed by journalists. Becker added that it was "customary for a news organization like Channel 5 to rely upon and

The facts proffered in the reporters' affidavits are essentially unchallenged; Kendrick for the most part does not dispute the defendants' representations about what happened. Kendrick argues, rather, that in three major respects the reporters' undisputed actions were negligent or, more accurately for purposes of this appeal, present questions of negligence for the jury, not for the court as a matter of law. In this connection, it is important to note that Kendrick, in specifying the defendant's negligence, does not question that the media defendants themselves, through their reporters, can proffer admissible testimony about the nature and degree of care "which ordinarily prudent persons engaged in the same kind of business"—broadcast journalism—"usually exercise under similar circumstances." Instruction No. 17–2.

■ The media defendants, as the parties moving for summary judgment, have the burden of showing a prima facie case that they were not negligent, before the burden of production shifts to the plaintiff as non-moving party. See *supra* Part II. (*Standard of Review*). We believe, however, that it is useful to focus on Kendrick's contentions and the defendants' responses together, in order to see where the differences are that create the dispute. From that perspective, we shall be able to discern whether the moving defendants have made their required initial showing and, if so, whether Kendrick has rebutted it sufficiently to leave a jury issue.

■ Kendrick argues, first, that the media defendants were negligent in failing to obtain his side of the story before reporting the challenged statements on the air. He

asks us to interpret and refine the standard of care by reference to an undated statement of principles by the American Society of Newspapers [20] and to a 1923 American Society of Newspaper Editors (ASNE) Code of Ethics quoted in his brief.[21] Kendrick, however, has not provided source citations for these authorities and, in any event, has not shown by proffered expert testimony or otherwise that these particular standards are customarily followed by journalists.[22] We therefore cannot accept them as authoritative.

It is undisputed that the media defendants' reporters made good faith attempts to reach Kendrick before the initial broadcasts. In their affidavits, moreover, all three experienced reporters, testifying under oath, averred that it was customary for reporters to rely upon and report information provided by police officials about the conduct of police authorities, and that in doing so they conducted themselves in accordance with the standards of care customarily observed by journalists. That customary standard of conduct was reflected in their efforts to obtain Kendrick's comments before reporting what Wilson had said. These affidavits are sufficient for a prima facie showing that, customarily, in the exercise of due care, a journalist reporting on statements by a high ranking police official is obliged, before publishing the police statement, "to take care that the statement made was true," Instruction No. 17–2, by seeking comment by persons reportedly involved in wrongdoing. But, according to a fair reading of these affidavits, the standard of due care does not preclude a reporter from publishing police statements, otherwise reasonably perceived as accurate, if that re-

republish information that it receives from wire services such as the Associated Press; that, in fact, is the purpose of a wire service."

20. This statement of principles apparently provides:
Every effort must be made to assure that the news content is accurate, free from bias and in context and that all sides are presented fairly.... [S]ignificant errors of fact, as well as omission, should be corrected promptly and prominently.
Persons publicly accused should be given the earliest opportunity to respond.

21. The ASNE Code is said to provide:

[A] newspaper should not publish unofficial charges affecting reputation or moral character without opportunity given to the accused to be heard[;] right practice demands the giving of such opportunity in all cases of serious accusation outside judicial proceedings.

22. In his opposition to the media defendants' motion for summary judgment and in his brief on appeal, Kendrick acknowledges that "[w]ritten standards and codes of conduct in the journalism profession are rare," and he notes that "[n]one of the movants developed or applied any written operational rules or guidelines."

porter has failed, after reasonable diligence, to locate someone criminally implicated by those statements. Kendrick has proffered no credible authority for the proposition that the media's right to publish, and the public's opportunity to learn, about police activity must be cancelled by the unavailability to the press of someone the police accuses—at least when the reporters involved, as in this case, have made timely and reasonable efforts to seek comment from that individual before publication. As indicated earlier, the proffered 1923 ASNE Code of Ethics, see *supra* note 18, cannot be used, absent verification and expert support, to make that case. Accordingly, we conclude as a matter of law that the media defendants have shown that they were not negligent under the circumstances in publishing Wilson's statements before they could reach Kendrick for comment and that appellant has failed to rebut that showing.

■ Second, Kendrick cites three articles published by The Washington Post, before Operation Recovery, which show that Wilson had been officially reprimanded for improprieties during a drug screening program and also had been criticized for his investigation of police leaks in Operation Caribbean Cruise. Kendrick then argues that these articles should have alerted the media defendants to the fact that Wilson was not a reliable source.[23] He further contends that, in light of these articles, the media defendants' failure to investigate further before reporting Wilson's statements amounted to negligence.

We note again that reporter Muse averred under oath that "[i]t is customary for reporters to rely upon, and report, information provided by police officials about the conduct of police activities." Even if we assume that the media defendants had notice of the three earlier newspaper articles discussing Wilson,

these articles did not rise to the level of making Wilson's statements to the press—offered in his capacity as the highest ranking police officer in charge of Operation Recovery—inherently suspicious. The press would have to withhold many important stories emanating from police headquarters if reporters had to question, and possibly verify, the credibility of high-ranking police sources because of highly speculative reasons based on earlier, unrelated events. We conclude as a matter of law that Wilson's earlier reprimand and criticism are insufficient to show that the media defendants were negligent in failing to investigate Operation Recovery and Deputy Chief Wilson further before reporting about that police operation on February 6, 1989.

■ Third, Kendrick stresses, as negligence, the fact that Channel 4 waited until February 14, 1989, to broadcast his statement that he had offered the police an apartment at Capitol Terrace to set up an observation post. As a matter of law, we disagree. On February 7, the day after Operation Recovery, Channel 4 broadcast Kendrick's denial of the allegation that he had tipped off drug dealers, as well as his statements that he had cooperated with the police and that the police had been lax in taking action about the drug problems at Capitol Terrace. There is nothing in Kendrick's affidavit or otherwise in the record to show, as Kendrick now claims on appeal, that Kendrick had also told Muse on February 7 that he had offered the police a surveillance unit at Capitol Terrace. Even assuming, however, that Kendrick had told Muse about this offer on February 7, we conclude as a matter of law that Channel 4 could not be deemed actionably negligent for failure to broadcast until February 14 this one detail from Kendrick's statement, since his basic message was timely reported.[24]

23. Kendrick also asserts that Wilson's previous difficulties, coupled with the circumstances surrounding Operation Recovery—including the fact that Channel 4 had been tipped about that operation—should have made the media defendants suspicious to the point of recognizing that Wilson was looking for a scapegoat to deflect blame for the failure of the operation.

24. Kendrick contended in the trial court, but does not press on appeal, that Channel 5—which had obtained Wilson's statements over the Associated Press wire rather than from interviewing Wilson—could not properly rely on these statements and thus had been negligent in reporting them. In *Phillips*, 424 A.2d at 89, this court held that a reporter could not rely on a recorded police "hot line" log as an official document to

In sum, Kendrick failed to proffer evidence which, if proved, would be adequate to rebut the media defendants' affidavits that they had followed established standards of care in reporting the challenged statements.[25] Both Muse and Bensen attempted, albeit unsuccessfully, to reach Kendrick before the initial broadcasts. Reporters Muse and Bensen, moreover, were careful to double-check with Wilson that the police were still looking into allegations involving Kendrick before broadcasting any such statement. When reporters for the media defendants were able to reach Kendrick the day after the first news reports of Wilson's statements, they reported Kendrick's responses that day. Nor does Kendrick proffer evidence sufficient to create a genuine issue as to whether the reporters spoke with, and reported the comments of, Capitol Terrace tenants rather than outsiders. Because Kendrick, therefore, proffered no adequate basis for finding that the media defendants acted negligently in reporting Wilson's or the tenant's statements, the trial court did not err in granting the media defendants summary judgment.

*Affirmed.*

provide the basis for an "official report privilege," because "the log represents little more than an informal arrangement between the police and the media[,] ... nothing more sanctified than unofficial statements of police regarding a crime." *Id.* In contrast, however, with this informal "hot line" in *Phillips,* it is well established that a news organization can reasonably rely on information received from other reputable news organizations such as the Associated Press. *See Nelson v. Associated Press, Inc.,* 667 F.Supp. 1468, 1476–80 (S.D.Fla.1987). Moreover, according to the affidavit of Channel 5's Becker, reliance on the Associated Press is customary for news organizations. Consequently, the trial court correctly held as a matter of law that Channel 5 was *not negligent in failing to* conduct an independent inquiry before reporting the story taken from the Associated Press.

Kendrick also argued before the trial court that, insofar as the tenants interviewed by Muse and Bensen were not publicly identified, the media defendants had been negligent in reporting the tenants' statements that Kendrick had threatened to evict them if they reported housing code violations and drug activity. Kendrick says there was no way of knowing that the persons interviewed actually were Capitol Terrace tenants. According to Kendrick, therefore, the media defendants should have investigated further before reporting the statements of these unidentified tenants. The trial judge, however, correctly noted that, because the reporters had gone inside the building to different apartments, there could be no question that the challenged statements were made by at least some tenants from Capitol Terrace.

25. To the extent that the reporters' affidavits do not clearly establish a standard of care applicable to a particular Kendrick contention, we are satisfied that no reasonable juror could find negligence on this record, for the reasons we have expressed as to each contention.