*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CV-1197

WILLIAM ARMSTRONG, APPELLANT,

V.

KAREN THOMPSON, *ET AL.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-4137-09)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued May 15, 2013                    Decided November 21, 2013)

*Kevin E. Byrnes* for appellant.

*Earl N. Mayfield, III*, for appellee Karen Thompson.

Before OBERLY and BECKWITH, *Associate Judges*, and REID, *Senior Judge*.

BECKWITH, *Associate Judge*:  Appellant William Armstrong, a former special agent with the Treasury Inspector General for Tax Administration (TIGTA),[1] was on the verge of leaving TIGTA to take a job at the United States Department of Agriculture (USDA) when the USDA abruptly rescinded its offer of employment after one of Mr. Armstrong's TIGTA coworkers sent six then-

---

[1] TIGTA is a division of the United States Department of the Treasury.

anonymous letters to the USDA avowing that the agency was making a "grave error" in offering Mr. Armstrong a job because he was under internal investigation for serious integrity violations and other misconduct and would be a liability to the USDA. Mr. Armstrong brought five tort claims against the letter writer, Karen Thompson, and her husband, David Sutkus—both also special agents at TIGTA—and he now appeals from Superior Court Judge Anthony Epstein's grant of summary judgment in appellees' favor on each of those claims.[2]

For the reasons stated below, we affirm that judgment with respect to Mr. Armstrong's claims of defamation, invasion of privacy (false light), invasion of privacy (publication of private facts), and intentional infliction of emotional distress. Because we see in the record genuine issues of material fact on which a jury could have found the elements of intentional interference with contractual relations, however, we reverse the grant of summary judgment on that claim.

## I. Background

In October 2006, Karen Thompson made an anonymous hotline complaint to the Department of the Treasury's Office of the Inspector General accusing her TIGTA coworker, William Armstrong, of unlawfully accessing various records

---

[2] Appellee David Sutkus has not filed an appellate brief in this matter.

and databases. The complaint triggered an internal investigation led by Rodney Davis, who was both Mr. Armstrong's supervisor and a person whom Mr. Armstrong had previously investigated. Around October 31, 2006, Mr. Armstrong received a letter indicating that he was under investigation and was reassigned to the Technical Services and Firearms Division to perform "other duties as assigned." While there is some dispute about whether Mr. Armstrong was "relieved of all law enforcement powers" and whether his status during the investigation was accurately deemed "administrative leave,"[3] it is undisputed that the agency removed his badge, credentials, and government vehicle, suspended his supervisory authority, and took away his government computer.

After the United States Attorney's Office declined to criminally prosecute Mr. Armstrong in February 2007, TIGTA continued its internal investigation of Mr. Armstrong for allegedly gaining unauthorized access to agency databases and disclosing the information he obtained to other TIGTA personnel. Mr. Armstrong told the investigating agents that he had, in fact, used the databases for personal use, but did so in an effort to protect himself from Rodney Davis, who he believed

---

[3] Mr. Armstrong clearly stated in a 2009 affidavit that he was "relieved of all law enforcement powers," but his May 22, 2011, affidavit claimed his "law enforcement status remained intact and was not revoked."

was discriminating against him, and to "see how other similarly situated agents were being treated."

When the Treasury Department investigation wrapped up in April 2007, the investigating team concluded in a Report of Investigation (ROI) that Mr. Armstrong had gained unauthorized access to two databases in violation of criminal law and had accessed a report without official need to know. Mr. Armstrong filed an appeal to the Merit Systems Protection Board challenging the validity, motivation, reliability, and sufficiency of the findings and investigative methodology. The parties reached a settlement agreement on February 7, 2008, before discovery was concluded. Mr. Armstrong agreed that TIGTA would impose a thirty-day suspension, that he would resign within 90 days after the execution of the agreement, and that the official record would "state that the reason for the suspension was misuse of a government computer and unauthorized access to agency files for personal use." The settlement acknowledged that Mr. Armstrong was not making any admission of "liability, fault, or error."

Before the parties had reached a settlement and while the administrative investigation was still ongoing, Mr. Armstrong began looking for another job. The woman at USDA who interviewed him for a criminal investigator position in March 2007 stated in her deposition that she had a favorable impression of Mr. Armstrong and that he had disclosed during the interview that he was under

internal investigation for allegedly making unauthorized access to a database and disclosing the information he had obtained. In August 2007 the USDA offered Mr. Armstrong a job, scheduled to begin that September.

After Mr. Armstrong had accepted the USDA job, that agency received six anonymous letters—two distinct versions, each addressed to three different recipients—disclosing information about TIGTA's investigation of Mr. Armstrong. The letters ultimately led the USDA to rescind Mr. Armstrong's employment offer. One letter stated, for example, that Mr. Armstrong was under internal investigation by TIGTA "for suspected violations of both a criminal and administrative nature," that he had chosen to leave TIGTA "with the threat of termination hanging over his head," and that the USDA had "opened itself up to potential liability" in hiring Mr. Armstrong. The other said the USDA was making a "grave error" in hiring Mr. Armstrong, stated that he was under investigation for "gross misconduct and integrity violations," and concluded: "I guess it is true what they say about the government. Instead of dealing with the problem, you pass the problem onto someone else. Well I guess [Mr. Armstrong] is your problem now."

Mr. Armstrong at first believed that the letters were sent by Rodney Davis in retaliation for Mr. Armstrong's previous investigation of him and for Mr. Armstrong's complaints to TIGTA about Mr. Davis's work performance and unfair treatment of employees. Contending that the letters disclosed information from a

government system of records, he sued the Department of the Treasury, his former supervisor Mr. Davis, and other unnamed employees of TIGTA in federal district court under the Privacy Act, 5 U.S.C. § 552a (b), and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. *Armstrong v. Geithner*, 610 F. Supp. 2d 66 (D.D.C. 2009). On the eve of that trial, Ms. Thompson admitted that she had written and mailed the letters to the USDA. *Id.* at 69. Mr. Sutkus admitted that he was aware of the letters and their contents, although he denied having helped Ms. Thompson draft the letters.

The federal court ruled in favor of the defendants, finding that the information in the disclosed letters did not come from the Treasury Department's system of records, as required for Mr. Armstrong to prevail in the Privacy Act claim. *Id.* at 71. In the judge's view, "the record of this case establishes nothing more than that Thompson collated what she knew from her own complaint, from her own observations and speculation and those of others, from the rumor-mill that apparently goes virtually unchecked at TIGTA, and from other non-covered sources." *Id.* The judge deemed the remaining claims to be barred "by 28 U.S.C. § 2680 (h) or unsupported by the evidence." *Id.* The U.S. Court of Appeals for the District of Columbia Circuit affirmed that ruling. *Armstrong v. Geithner*, 608 F.3d 854 (D.C. Cir. 2010).

On June 5, 2009, Mr. Armstrong filed suit in D.C. Superior Court, asserting various tort claims against Ms. Thompson and Mr. Sutkus. Both defendants sought certification from the U.S. Attorney's Office that they were acting within the scope of their employment at all times relevant to Mr. Armstrong's claims, but the U.S. Attorney's Office refused to provide it. When Ms. Thompson and Mr. Sutkus removed the case to U.S. District Court for review of that refusal, the court concluded that neither employee was acting within the scope of his or her federal employment when writing and mailing the letters to the USDA. *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 97 (D.D.C. 2011). The case was then remanded to Superior Court, where in June 2012 Judge Epstein granted Ms. Thompson's and Mr. Sutkus's motions for summary judgment on all five claims: defamation, intentional infliction of emotional distress, false light, publication of private facts, and intentional interference with prospective contractual relations.

## II. Analysis

We review a grant or denial of a motion for summary judgment de novo. *Clampitt v. American Univ.*, 957 A.2d 23, 28 (D.C. 2008) (citing *Kotsch v. District of Columbia*, 924 A.2d 1040, 1044 (D.C. 2007)). "Our standard of review is the same as the trial court's standard for initially considering a party's motion for summary judgment; that is, summary judgment is proper if there is no issue of

material fact and the record shows that the moving party is entitled to judgment as a matter of law." *Id.* (citing Super. Ct. Civ. R. 56 (c)). "On review of summary judgment, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Rosen v. American Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1255 (D.C. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (alteration in original). Summary judgment is improper if there is evidence on which the jury could reasonably find for the non-moving party. *Han v. Southeast Acad. of Scholastic Excellence Pub. Charter Sch.*, 32 A.3d 413, 416 (D.C. 2011) (citing *Jones v. Thompson*, 953 A.2d 1121, 1124 (D.C. 2008)).

## A. The Defamation Claim

Mr. Armstrong's lead claim is that appellees' actions in sending the letters to his prospective employer constituted defamation. To assert a defamation claim in the District of Columbia, a plaintiff must allege:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Blodgett v. University Club*, 930 A.2d 210, 222 (D.C. 2007) (citing *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)); RESTATEMENT (SECOND) OF TORTS ("RESTATEMENT") § 558 (1977).

The trial court granted summary judgment on the defamation claim on the ground that "Mr. Armstrong has not offered evidence that raises a genuine issue that the statements made about him in Ms. Thompson's letters are false." Specifically, the court stated that the factual assertions in the letters were substantially true and the remaining statements in question were nonactionable statements of opinion. We agree.

Like many other jurisdictions, we recognize "substantial truth" as a defense to defamation. *See Foretich v. CBS, Inc.*, 619 A.2d 48, 60 (D.C. 1993); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988) (quoting RESTATEMENT § 581A (1977)) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance"); *Moldea v. New York Times Co.*, 15 F.3d 1137, 1150 (D.C. Cir. 1994) (*Moldea I*) ("When a trial court can find as a matter of law that a challenged publication is substantially true, then it may properly grant judgment for the defendant."). In determining whether factual statements in an allegedly defamatory communication are substantially true, we discount minor inaccuracies "so long as the substance, the gist, the sting,

of the libelous charge be justified." *Moldea v. New York Times Co.*, 22 F.3d 310, 318 (D.C. Cir. 1994) (*Moldea II*) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)); *accord Liberty Lobby*, 838 F.2d at 1296 (statement not defamatory because "[t]he sting of the charge . . . is substantially true"). Even if conveying only true facts, a communication can be defamatory by implication if, "by the particular manner or language in which the true facts are conveyed, [the communication] supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). Substantial truth will succeed as a defense if "a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn." *Id.*

In addition, while statements of fact "may be the basis for a defamation claim, a statement of pure opinion cannot." *Rosen*, 41 A.3d at 1256 (citing *Gibson v. Boy Scouts of Am.*, 360 F. Supp. 2d 776, 781 (E.D. Va. 2005)). "[A] statement of opinion is actionable if—but only if—'it has an explicit or implicit factual foundation and is therefore objectively verifiable.'" *Id.* (quoting *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000)).

## 1. The Court's Reliance Upon the Report of Investigation

As a threshold matter, Mr. Armstrong challenges the trial court's reliance upon the Treasury Department's Report of Investigation in determining that various statements in Ms. Thompson's letters were substantially true. Citing *Evans-Reid v. District of Columbia,* 930 A.2d 930 (D.C. 2007), he argues that the ROI should not have been introduced or relied upon because it constituted hearsay. As appellees point out, however, Super. Ct. Civ. R. 43-I provides that copies of agency records made in the regular course of business are admissible. Their contention that the *Evans-Reid* rule excluding internal investigatory records applies only to criminal investigations and those done in anticipation of litigation, and not to independent factfinding conducted in the ordinary course of agency business, is supported by the Federal Rules of Evidence. *See* Fed. R. Evid. 803 (8)(a)(iii) ("A record or statement of a public office" is not excluded as hearsay "if it sets out in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation."). Even if the ROI were inadmissible hearsay, each ROI assertion upon which the trial court relied appears elsewhere in the record or is acknowledged in Mr. Armstrong's appellate brief.[4]

---

[4] These include:

(continued…)

## 2. Substantial Truth

Mr. Armstrong alleges that several of the statements in Ms. Thompson's letters to the USDA are false. We disagree, and conclude that no reasonable juror could deny the substantial truth of each of the statements to which Mr. Armstrong objects, even when construing all disputed issues of fact in the light most favorable to Mr. Armstrong.

Mr. Armstrong contends that the most damning claim in Ms. Thompson's

---

(…continued)

Undisputed Material Fact 13: "The conduct by Mr. Armstrong that TIGTA investigated involved possible violations of criminal law." *See* Affidavit of William H. Armstrong (May 22, 2002) at ¶1 ("I was told that criminal allegations had been made against me . . . This was the first and only time TIGTA had informed me I was under criminal investigation").

Undisputed Material Facts 14 and 15: "[14] The matter was referred to the United States Attorney's Office as a criminal matter. [15] In February 2007, the U.S. Attorney's Office declined to prosecute Mr. Armstrong." *See* Appellant's Brief at 5; *Armstrong v. Geithner*, 610 F. Supp. 2d 66, 68 (D.D.C. 2007) ("On February 7, 2007, the U.S. Attorney's Office declined to prosecute Armstrong").

Undisputed Material Fact 20: "In April 2007, the Special Inquiries and Intelligence Division ("SIID") of TIGTA completed its investigation. SIID concluded that Mr. Armstrong had made unauthorized accesses to two databases in violation of criminal law, accessed a report without official need to know, and made accesses to a database for personal reasons. The allegations that he made unauthorized disclosures of information was [sic] not substantiated." *See* Appellant's Brief at 4 ("Mr. Davis led a team that drafted up a series of charges for criminal referral which claimed that Mr. Armstrong had violated criminal law by accessing the Agency's own personnel database"); *Armstrong v. Geithner*, 610 F. Supp. 2d 66, 68.

letters was that "Mr. Armstrong was under internal investigation by his own agency for suspected violations of both a criminal and administrative nature." The trial court erred, he says, in deeming this assertion "substantially true," because, at the time Mr. Armstrong applied for a position at the USDA and was offered employment there, "[t]he criminal investigation had been concluded and the administrative investigation had not been pursued." Yet the fact that Mr. Armstrong was under both criminal and administrative investigation over roughly the same period during which he applied for and accepted the USDA position is not disputed, and the "gist" or "sting" of Ms. Thompson's statement is not materially distinguishable from the facts with which Mr. Armstrong counters.

In her letters, Ms. Thompson, who called appellant "Harry," wrote:

> Harry Armstrong was an Assistant Special Agent in Charge at [TIGTA] until October 31, 2006 when he was escorted out of the building and forced to turn in his gun, badge, equipment, cell phone, computer and government car keys because he was under investigation for gross misconduct and integrity violations (some of them criminal). He was removed from all managerial and law enforcement duties and sent to another office where he had no access to computer systems, law enforcement sensitive information, etc.

In another letter she wrote that "Mr. Armstrong was stripped of his law enforcement credentials . . . and placed in an administrative status." These statements are substantially true. Mr. Armstrong's own affidavit acknowledges the

revocation of his law enforcement accessories, and Mr. Armstrong *was* under criminal investigation. *See* Affidavit of William H. Armstrong (May 22, 2002) at ¶1 ("I was told that criminal allegations had been made against me."). Mr. Armstrong argues that the term "administrative status" signifies a much more serious disciplinary action than what the agency imposed. Yet Ms. Thompson's failure to use the precise term of art to describe the agency's reaction to Mr. Armstrong's wrongdoing does not make her statement false. It is substantially true, at least, that Mr. Armstrong was stripped of his law enforcement credentials and placed in an administrative status, working behind a different desk on matters that did not require his former level of security clearance.

Mr. Armstrong also takes issue with Ms. Thompson's intimation that Mr. Armstrong remained under criminal investigation at the time he sought a position with the USDA—a suggestion he says stems from her failure to mention that the U.S. Attorney's Office had declined to prosecute Mr. Armstrong. We disagree that Ms. Thompson's failure to state that the criminal investigation had ended implied the opposite—that it was ongoing. And nothing in the record suggests that Ms. Thompson intended or endorsed that false inference.

Mr. Armstrong further challenges the trial court's ruling that Ms. Thompson's statement in the letters that Mr. Armstrong had "the threat of

termination hanging over his head" when he applied to the USDA was not false. While Mr. Armstrong contends that no one proposed terminating him until September 2007, the substantial truth of the statement—the "sting" or "gist"—is hard to deny. That Mr. Armstrong eventually agreed to resign as part of his settlement tends to bolster the claim, notwithstanding his contention that the possibility of termination only came into play after the USDA revoked his offer of employment and it became clear that he wanted to leave and intended to sue TIGTA.

With respect to the truth or falsity of Ms. Thompson's claim that Mr. Armstrong was under investigation for "passing along information to his friends at the Agency," the fact that he had been investigated for that behavior makes Ms. Thompson's characterization at least substantially true, even assuming the initial investigation cleared him of any wrongful disclosures. There is, again, no additional affirmative suggestion in the statement that Ms. Thompson intended or endorsed a false inference. The statement in the letters that Mr. Armstrong "admitted to looking up information on his subordinates, co-workers, etc." is also true, and is affirmed by Mr. Armstrong's statements in his first affidavit that "I told the Agents I accessed [a government database] to try to protect myself from Mr. Davis who I believed was treating me in a disparate and discriminatory fashion"

and that those "accesses were designed to see how other similarly situated agents were being treated."

Mr. Armstrong further claims that the falsity of Ms. Thompson's statement that "[a]t the time the USDA offered Harry a job the investigation on him had been completed" supports a defamation claim given that TIGTA never stated that it had completed its investigation at any time prior to September 4, 2007. Ms. Thompson's mistake cannot be considered more than an insignificant inaccuracy, if an inaccuracy at all. *See Foretich*, 619 A.2d at 60 (noting the immateriality of slight inaccuracies where the defamatory statement is true in substance); RESTATEMENT § 581A cmt. f (1977). Given Mr. Armstrong's own contention, in response to another of Ms. Thompson's allegations, that his "criminal investigation had been concluded" at the time he applied for and accepted a USDA position, Ms. Thompson's characterization of the investigatory timeline is at least substantially true.

Taken on its own, Ms. Thompson's statement that "the allegations of misconduct and serious integrity violations were proven to be true" might imply a defamatory meaning, and we take Mr. Armstrong's point that the TIGTA investigation, especially prior to his appeal to the Merit Systems Protection Board, was not a final, proven verdict on his misconduct or integrity violations. In determining whether a communication is capable of a defamatory meaning,

however, "a court must examine the entire context of a publication." *White*, 909 F.2d at 526 (citing *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir. 1987)); *see also Moldea I*, 15 F.3d at 1150 (noting that the plaintiff had to "do more than simply establish that[,] although the bulk of [an allegedly defamatory] review's criticisms of his work [were] valid, it [was] marred by minor inaccuracies").

The trial court viewed this statement as one of opinion, and we agree that the characterization of the allegations as "serious integrity violations" was unverifiable and therefore a nonactionable opinion. But the "proven to be true" clause was fact-based and therefore warranted summary judgment only if it was substantially true as a matter of law. Because at the time Ms. Thompson wrote the letters, the criminal investigation into Mr. Armstrong's misconduct had been completed and referred to the Attorney General's office, the "gist" or "sting" of the allegation is not so fundamentally different from the truth that it could be capable of a defamatory meaning. The choice of the word "proven" is a minor inaccuracy, but substantially true in the context of the letter.

### 3. Opinion

In ruling that the rest of the statements in Ms. Thompson's letters to the USDA were incapable of defamatory meaning, the trial court determined that they were assertions of opinion that were unverifiable and therefore not actionable as

defamation. Mr. Armstrong challenges the court's decision to dismiss "as mere opinion" what he deems "the most serious statements" Ms. Thompson made regarding his integrity and his alleged misconduct.

The line between fact and opinion is not always bright:

> Needless to say, it will often be difficult to assay whether a statement is verifiable. Statements made in written communication or discourse range over a spectrum with respect to the degree to which they can be verified rather than dividing neatly into categories of "verifiable" and "unverifiable." But even if the principle of inquiring as to verifiability provides no panacea, this approach will nonetheless aid trial judges in assessing whether a statement should have the benefit of the absolute privilege conferred upon expressions of opinion.

*Ollman v. Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984). *See also Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983) (stating that, in deciding whether the challenged statements are opinion, "the court must consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity" and statements that cannot "readily be proven true or false" are "more likely to be viewed as statements of opinion, not fact").

Mr. Armstrong argues that Ms. Thompson had no basis for stating in the letters that "had [the USDA] known of the circumstances surrounding his

departure, [the USDA] would not have made an offer of employment to him."[5] The trial court agreed with Ms. Thompson that this claim was an opinion that subsequent events confirmed. That Mr. Armstrong had alerted the USDA to his situation at TIGTA did not alter the essence of Ms. Thompson's statement. Ms. Thompson could not know how the letters' recipients at the USDA would have reacted if they had more information at the time they offered Mr. Armstrong a position. Her statement was a plain assertion of opinion: she believed they might have acted differently under those circumstances. That Ms. Thompson's opinion was corroborated by the revocation of Mr. Armstrong's offer upon receipt of the letters—and thus could be said to have turned out to be "true"—rendered the statement even less capable of defamatory meaning.

We also agree with the trial court that Ms. Thompson's various characterizations of Mr. Armstrong's alleged misconduct were opinions not based on verifiable facts. Throughout the two versions of the letter, Ms. Thompson referred to the focus of the TIGTA investigation as "serious integrity violations," "serious misconduct and other violations," "gross misconduct and integrity violations," and "serious issues of misconduct, integrity violations and unethical

---

[5] In the other version of the letter, Ms. Thompson similarly wrote that "the USDA is making a grave error by hiring Special Agent . . . Armstrong to work in the Office of Investigations."

behavior." All of these reflected one person's subjective view of the underlying conduct and were not verifiable as true or false.

Relatedly, we agree that Ms. Thompson's statements referring to Mr. Armstrong as a liability to the USDA constituted opinions with which the letters' recipients could agree or disagree and which were not based on underlying facts that could be proven or disproven, other than possibly the substantially true facts discussed above. Ms. Thompson wrote that "Harry is now a liability to your agency," that "I can only imagine the giglio-henthorn[6] issues he will create for the USDA," and, in the second version, that "[b]y hiring Mr. Armstrong, your agency has opened itself up to potential liability and Giglio/Henthorn issues in the future should Mr. Armstrong ever be called to testify on behalf of your agency in a criminal or civil proceeding." Mr. Armstrong argues that the way in which Ms. Thompson asserted these opinions—for example, her statement, with emphasis added by Mr. Armstrong, that "Harry *is* now a liability to your agency"—made them facts. In the context of the letters, however, Ms. Thompson was stating her opinion about the import of the substantially true facts she presented. Mr.

---

[6] Ms. Thompson refers to the government's obligation, pursuant to the decisions in *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), to disclose to defendants information from testifying agents' personnel files that may be used to impeach the agents' credibility.

Armstrong does not deny that he might have faced *Giglio* and *Henthorn* issues, and only argues that it is patently false that he *certainly* would face those issues. It was Ms. Thompson's opinion that he would.

## B. Invasion of Privacy

Mr. Armstrong appeals the grant of summary judgment to appellees with respect to two invasion of privacy torts: false light and publication of private facts.

### 1. False Light

To succeed on a claim of false light invasion of privacy, a plaintiff must show: "(1) publicity (2) about a false statement, representation, or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999) (citing RESTATEMENT § 652E (1977)). These elements are similar to those involved in analysis of a defamation claim, and "a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Moldea II*, 22 F.3d at 319 (citing *Moldea I*, 15 F.3d at 1151); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

As Mr. Armstrong rests his false light claim on the same allegations as his defamation claim, we will analyze them in the same manner. *See Blodgett*, 930 A.2d at 223.

As an initial matter, the letters were not made public as required by the first prong of the Restatement test. As the trial court pointed out in its order, citing *Steinbuch v. Cutler*, 463 F. Supp. 2d 1 (D.D.C. 2006), "publicity" for the purposes of invasion of privacy torts "means that the matter is made public" by having been communicated "to the public at large, or to so many persons that the matter must be regarded as *substantially certain to become one of public knowledge*." *Id.* at 3 (quoting RESTATEMENT § 652D (1977)) (emphasis added in *Steinbuch*). Such substantial certainty, in this case, would require much broader dissemination than a mailing of a handful of letters to a handful of employees at a single agency. In any event, as Ms. Thompson's letters to the USDA were not defamatory as a matter of law, the allegedly tortious letters fail to meet the requirement that they be about a false statement, representation, or imputation.

Because the facts in the record, taken in the light most favorable to Mr. Armstrong, fail to provide evidence to satisfy the first two elements of a false light claim, we need not analyze the remaining two factors. The trial court did not err in ruling, as a matter of law, that Ms. Thompson was not liable for allegedly placing

Mr. Armstrong in a false light.

## 2. Publication of Private Facts

Mr. Armstrong also contests the trial court's grant of summary judgment to appellees on his publication of private facts claim. "In the District of Columbia, to recover on the first theory, a plaintiff must show that the defendant (1) published private facts (2) in which the public has no legitimate concern and (3) which publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities." *White*, 909 F.2d at 517 (quoting *Dresbach v. Doubleday & Co.*, 518 F. Supp. 1285, 1287 (D.D.C. 1981)). As the "publicity" requirement for a publication of private facts claim is the same for all invasion of privacy torts, *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 711 (D.C. 2009), we affirm the court's grant of summary judgment to the appellees on this third count as well.

## C. Intentional Infliction of Emotional Distress

"To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (quoting *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008)). "For a

defendant to be liable for intentional infliction of emotional distress . . . '[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that . . . his conduct has been characterized by "malice" . . .'" *Weaver v. Grafio*, 595 A.2d 983, 991 (D.C. 1991) (quoting RESTATEMENT § 46 cmt. d (1965)) (alteration in *Weaver*). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994) (quoting RESTATEMENT § 46, cmt. d (1965)).

While we do not doubt that Ms. Thompson's conduct caused Mr. Armstrong distress, we agree with the trial court that no reasonable juror could find that his distress was so severe as to satisfy the third prong of the tort, *see Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003) ("'mental anguish' and 'stress' would not rise to the level of the 'severe emotional distress' required by the case law"), or that Ms. Thompson's behavior was so outrageous as to go beyond all possible bounds of decency, *cf. Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) (in which sexual harassment by a supervisor in the workplace was sufficiently outrageous to reverse a grant of summary judgment); *Herbin v. Hoeffel*, 806 A.2d 186, 189 (D.C. 2002) (in which spoliation of favorable evidence and breaching of confidence by a public defender in relation to his client was

likewise sufficiently outrageous). The circumstances of this case do not strike us as more outrageous than cases in which that requirement was not satisfied, such as *Weaver v. Grafio*, 595 A.2d 983 (D.C. 1991), where a house painter mailed employers a copy of a letter he had sent to the ethics committee of the D.C. Bar accusing them of a felony for knowingly passing a bad check; *Williams v. Callaghan*, 938 F. Supp. 46 (D.D.C. 1996), where an attorney failed to zealously advocate on behalf of his client; or *Howard Univ. v. Baten*, 632 A.2d 389 (D.C. 1993), where a university fired a professor without just cause. We therefore affirm the court's grant of summary judgment on this claim.

## D. Intentional Interference with Prospective Contractual Relations

The trial court stated that Mr. Armstrong's claim of intentional interference with a prospective employment contract—a form of the tort of intentional interference with contractual relations, *see Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458 (D.D.C. 1994)—"fails because no reasonable jury could infer from the evidence that it was improper or unjustified for Ms. Thompson to mail the letters to USDA." We see the record differently.

To make out a prima facie case of intentional interference with contractual or business relations, Mr. Armstrong must prove: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the

relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012) (quoting *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008)). There is little question that on the facts of this case a jury could find these basic four elements to be satisfied.

Ms. Thompson contends that there is an implied qualification to the tort's third element—namely, that the plaintiff must demonstrate that the interference was wrongful or improper—and that Mr. Armstrong cannot furnish such proof. While she is correct that a defendant may avoid liability if she can demonstrate that her conduct was "legally justified or privileged," *Onyeoziri*, 44 A.2d at 286, the burden is on the defendant to prove that her interference was not wrongful, not on the plaintiff to prove that it was. *See NCRIC*, 957 A.2d at 901 (D.C. 2008). "The Restatement's reference to 'improper' conduct"—that is, RESTATEMENT (SECOND) OF TORTS § 767 (1977), upon which the trial court relied in this case—"is simply another way of saying that the alleged tortfeasor's conduct must be legally justified." *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989). So when the defendant can establish that his or her conduct

was "legally justified or privileged," no cause of action exists.[7] *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 326 (D.C. 2008) (quoting *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991)).

In determining whether conduct that allegedly rose to intentional interference was improper or legally justified, finders of fact must weigh seven factors, including "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Onyeoziri*, 44 A.3d at 291 (quoting RESTATEMENT § 767 (1977)). The trial court emphasized the social interest prong (e), concluding that the societal interest in encouraging the transmission of truthful information

---

[7] As to the question of privilege, we have generally found a defendant to be privileged when he or she acts in order to protect his or her own existing economic interests. *See Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991); *NCRIC*, 957 A.2d at 890. The defense of privilege "is of narrow scope [] and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." *NCRIC*, 957 A.2d at 901 (citing RESTATEMENT § 773 cmt. a (1977)) (internal quotation marks omitted)). In these circumstances, a reasonable juror could conclude that Ms. Thompson was not acting to protect her own legally protected interests, economic or otherwise, and that her conduct was not privileged.

about a law enforcement agent to a government agency outweighed Ms. Thompson's malicious motive and the interests sought to be advanced by Ms. Thompson.

Yet reasonable minds could differ on the outcome of this balancing test and on the question whether Ms. Thompson was legally justified in intentionally interfering with Mr. Armstrong's prospective employment. In the 2009 Privacy Act case during which Ms. Thompson admitted her authorship of the letters, for example, the federal district judge called her conduct "completely deliberate" and "quite possibly unlawful." Another federal judge who ruled in 2011 that Ms. Thompson was not acting within the scope of her employment when she wrote the letters stated that "her motivation to send the letters did not spring from a desire to serve the TIGTA specifically, or the United States generally" and that "the record supports the conclusion that Ms. Thompson was motivated by personal motives . . . ." *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011). In circumstances as ambiguous as those here, the type of balancing that is triggered by the seven-factor Restatement test is for the jury to undertake. *See, e.g.*, *Onyeoziri,* 44 A.3d at 290 (stating that "[o]n this record," the question whether appellees' insistence on going ahead with a scheduled foreclosure after appellant secured a contract to sell the property "is not an issue that can be decided as a matter of law").

Following settled law in the District of Columbia, the trial court based its determination that the interference at issue in this case was proper on the seven-factor test as spelled out in RESTATEMENT § 767. *See Onyeoziri*, 44 A.3d at 291. Because we conclude, contrary to the trial court's ruling, that a jury could have decided otherwise, we reverse the court's grant of summary judgment on Mr. Armstrong's intentional interference with prospective contractual relations claim.[8]

---

[8] In a Rule 28 (k) letter filed after oral argument, *see* D.C. App. R. 28 (k), Ms. Thompson argued for the first time that the truthfulness of her allegations to the USDA should preclude liability for intentional interference under § 772 (a) of the RESTATEMENT (SECOND) OF TORTS (1977), which provides that "[o]ne who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person truthful information." RESTATEMENT § 772 (a) (1977). We decline to consider this claim because Ms. Thompson did not raise it in her appellate brief. *See Dyer v. William S. Bergman & Assocs.*, 657 A.2d 1132, 1137 n.5 (D.C. 1995) (holding that a defendant waived his contention that the court should adopt the "truthful statement" defense to an intentional interference claim by failing to raise the issue before the trial court and in his first appeal). Ms. Thompson's brief does defend the trial court's determination—after balancing the factors for evaluating the impropriety of the alleged interference under RESTATEMENT § 767—that her conduct was legally justified because she was providing truthful information to a government agency, but she did not argue here or in the trial court that truthfulness was a complete defense under RESTATEMENT § 772. The question is not an uncomplicated one: this court has never explicitly adopted § 772 and other jurisdictions have declined to do so. *See, e.g.*, *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 185 (3d Cir. 1997) (noting that the Pennsylvania courts "have not stated that the truth of a statement in itself will defeat the tort claim but instead have focused on the broader issue of what constitutes a justified or privileged interference with prospective contractual relations").

## III.  Conclusion

For the reasons stated in this opinion, the Superior Court's judgment is reversed in part (with respect to the intentional interference with contractual relations claim) and affirmed in part (with respect to all remaining tort claims), and the case is remanded for further proceedings.[9]

*So ordered.*

---

[9] Our holding that the trial court erred in granting Ms. Thompson summary judgment on Mr. Armstrong's claim of intentional interference with prospective contractual relations means that the court also erred in granting Mr. Sutkus summary judgment on that claim.  By the same token, because Ms. Thompson is not liable as the principal for defamation, invasion of privacy, or intentional infliction of emotion distress, Mr. Sutkus cannot be liable for those torts as an aider and abettor.