# District of Columbia
# Court of Appeals

**No. 14-CV-792**

KAREN THOMPSON,

Appellant,



FILED
APR - 7 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

CAB-4137-09

WILLIAM H. ARMSTRONG,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: BLACKBURNE-RIGSBY and BECKWITH, Associate Judges; and FARRELL, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment for the appellee is reversed, and the matter is remanded with instructions for the trial court to enter judgment in favor of the appellant.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: April 7, 2016.

Opinion by Senior Judge Michael W. Farrell.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-792

KAREN THOMPSON, APPELLANT,

v.

WILLIAM H. ARMSTRONG, APPELLEE.

FILED 4/7/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CAB-4137-09)

(Hon. Stuart G. Nash, Trial Judge)

(Argued February 29, 2016                    Decided April 7, 2016)

*Joshua J. Fougere*, with whom *Joseph R. Guerra*, *Noah T. Katzen*, and *Arthur B. Spitzer* were on the brief, for appellant.

*Kevin Byrnes* for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

FARRELL, *Senior Judge*: A jury awarded William H. Armstrong sizable damages in his suit alleging intentional interference with a prospective contractual relationship by Karen Thompson. Before us is Ms. Thompson's appeal contending, mainly, that she was erroneously denied judgment as a matter of law because the suit, premised on true or non-provably false statements she had made

to a government agency about Mr. Armstrong's fitness for a law enforcement position, was precluded by the First Amendment. In light of what we conclude was Mr. Armstrong's status as a public official at the time, we agree with Ms. Thompson and reverse the judgment in Mr. Armstrong's favor.[1]

## I.     Background

### A.

The facts underlying Mr. Armstrong's multi-count suit against Ms. Thompson are described in our earlier opinion, *Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) (*Armstrong I*), as follows:

> [Mr.] Armstrong, a former special agent with the Treasury Inspector General for Tax Administration (TIGTA), was on the verge of leaving TIGTA to take a job at the United States Department of Agriculture (USDA) when the USDA abruptly rescinded its offer of employment after one of Mr. Armstrong's TIGTA coworkers sent six then-anonymous letters to the USDA avowing that the agency was making a "grave error" in offering Mr. Armstrong a job because he was under internal investigation for serious integrity violations and

---

[1] We accordingly have no occasion to reach Ms. Thompson's alternative claims of trial error.

other misconduct and would be a liability to the USDA.

*Id*. at 180 (footnote omitted.).[2]  On the basis of these letters, Mr. Armstrong brought five tort claims against the letter writer, Ms. Thompson:  defamation, invasion of privacy (false light), invasion of privacy (publication of private facts), intentional infliction of emotional distress, and intentional interference with contractual relations.  Following discovery, the trial court (Judge Epstein) granted summary judgment to Ms. Thompson on each claim after applying the common-law elements of each tort.  On Mr. Armstrong's appeal, this court affirmed that decision as to the first four claims.  With particular focus on the defamation claim, the court analyzed in detail Ms. Thompson's letters to the USDA and concluded that "no reasonable juror could deny the substantial truth of each of the statements [of fact] to which Mr. Armstrong objects," and that the rest of the statements "were assertions of opinion that were unverifiable and therefore not actionable as defamation." *Id*. at 185, 187.[3]

---

[2]  TIGTA is a division of the United States Department of Treasury.

[3]  The court's affirmance on the twin invasion of privacy counts rested on the substantial overlap of the elements of those torts with the elements of defamation, *Armstrong I*, 80 A.3d at 188-89, and on the principle that "a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Id*. at 188 (citations and internal quotation marks omitted).  Regarding the emotional distress claim, we concluded

(continued…)

This court reversed, however, as to Mr. Armstrong's claim of intentional interference with contractual relations. As a defense to that tort, we recognized, the defendant may seek "to prove that her interference was not wrongful," *id*. at 190, and in determining whether that burden has been met courts, "following settled law in the District of Columbia," must weigh seven factors as spelled out in the RESTATEMENT (SECOND) TORTS § 767 (1977). *Id.* at 191. Unlike the trial judge, we concluded that on the evidence proffered by Mr. Armstrong, "reasonable minds could differ on the outcome of this balancing test and on . . . whether Ms. Thompson was legally justified in intentionally interfering with Mr. Armstrong's prospective employment." *Id.*

At the same time, we took note of the fact that in a post-argument submission to this court Ms. Thompson had "argued for the first time that the truthfulness of her allegations to the USDA should preclude liability for intentional interference under § 772 (a) of the RESTATEMENT." *Id*. at 191 n.28.[4] But, we

_____

(…continued)

that "no reasonable juror could find that [Mr. Armstrong's] distress was so severe as to satisfy the third [element] of the tort of intentional infliction." *Id*. at 189.

[4] RESTATEMENT § 772 (a) states that "[o]ne who intentionally causes a third person . . . not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person . . . truthful information."

observed, "this court has never explicitly adopted § 772," and we declined to consider the issue — "not an uncomplicated one" — because Ms. Thompson had not argued "in her appellate brief . . . or in the trial court that truthfulness was a complete defense under RESTATEMENT § 772," *id.*, citing "*Dyer v. William Bergman & Assocs.*, 657 A.2d 1132, 1137 n.5 (D.C. 1995) (defendant waived his contention that the court should adopt the 'truthful statement' defense to an intentional interference claim by failing to raise the issue before the trial court and in his first appeal)." In *Armstrong I*, therefore, we "remanded [the case] for further proceedings" limited to the intentional interference claim. *Id*. at 192.

## B.

In moving originally for summary judgment, Ms. Thompson had argued that, besides common law defenses entitling her to judgment as a matter of law, the First Amendment shielded her completely from liability for truthful or not provably false statements made to the USDA about Mr. Armstrong, a public official, citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), and *Cohen v. Cowells Media Co.*, 501 U.S. 663 (1991). Judge Epstein did not reach the First Amendment argument because of his resolution of each tort-claim on common law grounds. After this court's partial reversal, Ms. Thompson renewed before the trial

court (now Judge Nash) the defense that her non-defamatory statements of fact and opinion about a "public official" were fully protected by the First Amendment. Judge Nash declined to consider the argument, however, because he deemed this court to have held that both the common law (RESTATEMENT § 772) and First Amendment defenses were waived. See JA 84-85 (finding no "possibility that this court could, consistent with the Court of Appeals decision, grant summary judgment to [Ms. Thompson] on the ground that the communications contained exclusively truthful information"). At a later point, the judge reiterated that the First Amendment defense "is one of the arguments that I've found to have been waived." The case therefore proceeded to trial and verdict.

## II. Discussion

### A.

Ms. Thompson argues that both First Amendment and common law principles, specifically the RESTATEMENT (SECOND) TORTS § 772 (a), barred her liability as a matter of law for statements this court held were either substantially true factually or, as expressions of opinion, not provably false. Mr. Armstrong counters at the outset that both arguments are foreclosed by *Armstrong I* (Br. for Appellee at 6). He is only partly right. In that appeal, this court rejected Ms.

Thompson's invitation for us to adopt § 772 (a) because neither in the trial court nor on appeal had she argued, contrary to settled law in this jurisdiction, "that truthfulness was a complete defense under Restatement § 772." *Id.* at 191 n.28. That ruling did not, as Ms. Thompson implies, merely postpone consideration of the issue to the trial court on remand; instead, we cited *Dyer v. William S. Bergman & Assocs., supra*, and its holding that the defendant there "waived" the § 772 argument "by failing to raise the issue before the trial court and in his first appeal." *Id.* Consequently, this holding of waiver by *Armstrong I* became the law of the case, *see, e.g.*, *Lynn v. Lynn*, 617 A.2d 963, 969 (D.C. 1992) (law of the case "precludes reopening questions resolved by an earlier appeal in the same case"), and Judge Nash correctly refused to consider the § 772 argument on remand.

Mr. Armstrong is mistaken, on the other hand, in arguing that *Armstrong I* rejected Ms. Thompson's First Amendment defense. The court there said nothing about potential First Amendment limits on Mr. Armstrong's ability to sue for intentional interference, for the obvious reason that Ms. Thompson had not raised it as an alternative ground for upholding the summary judgment granted by Judge Epstein (who in turn had not reached the First Amendment defense). On appeal, Mr. Armstrong takes no serious issue with Ms. Thompson's point that she was not obliged to raise the alternative ground for affirmance. *See, e.g.*, *Crocker v.*

*Piedmont Aviation, Inc.*, 49 F.3d 735, 740-41 (D.C. Cir. 1995) ("forcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation"). Instead, Mr. Armstrong points to a statement later by a motions division of this court, in denying Ms. Thompson's motion for stay of judgment after the jury's verdict, which Mr. Armstrong sees as tantamount to rejecting the First Amendment defense on the merits.[5] But in denying the stay request, the motions division well knew that it was not deciding the merits of Ms. Thompson's appeal but only, among other things, the likelihood of her succeeding on the merits. Its ruling was thus consistent with the doctrine that a merits division of the court may "depart[ ] from a motion division's ruling in the same case," *Kleinbart v. United States*, 604 A.2d 861, 867 (D.C. 1992), and that "law of the case is not established" by "denial of a stay." 18 B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, *et al*., FEDERAL PRACTICE & PROCEDURE § 4478.5 (2d ed. 2015).

Judge Nash therefore erred in concluding that *Armstrong I* foreclosed consideration of Ms. Thompson's First Amendment defense. But because, as will be apparent, no further development of the record is necessary to resolve the First

---

[5] The motions division observed that Ms. Thompson had not cited "any case binding in our jurisdiction that holds that the First Amendment precludes liability for truthful statements involving private figures on matters of private concern."

Amendment issues, a remand to the trial court for that purpose is unnecessary and we proceed to consideration of them.

**B.**

It is axiomatic that "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits . . . ." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). Although the protections which the First Amendment affords speech have been applied most prominently in suits for defamation, *see, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), their applicability to other torts has repeatedly been recognized. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (protections applied to intentional infliction of emotional distress); *Blodgett v Univ. Club*, 930 A.2d 210, 222-23 (D.C. 2007) ("a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion"). Unsurprisingly, therefore, courts have regularly held that First Amendment restrictions apply to suits for intentional interference with contractual relations. *See Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013); *Jefferson City Sch. Dist. No. R-1 v. Moody's Investor Servs., Inc.*, 175 F.3d 848, 856-58 (10th Cir. 1999); *Beverly Hills Foodland Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196-97 (8th

Cir. 1994); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990); *cf. Delloma v. Consol. Coal Co.*, 996 F.2d 168, 172 (7th Cir. 1993) (noting the "significant First Amendment problems" that would be raised by "permitting recovery for tortious interference based on truthful statements"). Mr. Armstrong's argument that defamation and intentional interference protect very different interests can be made regarding invasion of privacy or any of the other actions that courts have refused to distinguish for First Amendment purposes. The point, and the reason we align ourselves with the decisions just cited, is that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994).

## C.

The issue before us, then, is whether the First Amendment provides full protection from liability to Ms. Thompson for her statements about Mr. Armstrong to USDA that this court determined were either substantially true or not provably false. We conclude that it does.

The First Amendment "prohibits a public official from recovering damages

for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" *New York Times*, 376 U.S. at 279-80. The reason is that, "where the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth." *Garrison v. Louisiana*, 379 U.S. 64, 72-73 (1964). To prove "actual malice" in these circumstances, the public official must show by clear and convincing evidence "that the statement was made . . . with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80. And "actual malice" must be shown regardless of the speaker's motives. *See Garrison*, 379 U.S. at 74 (rejecting, under *New York Times Co.*, a Louisiana rule "permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood").

To decide whether Mr. Armstrong was required to prove actual malice on Ms. Thompson's part, therefore, we must ask whether Mr. Armstrong, a government employee, was a "public official" and, if so, whether Ms. Thompson's statements to USDA "relat[ed] to his official conduct." *New York Times, supra*. Together these questions implicate the third and broader one of whether Ms. Thompson's statements involved issues of public concern, because "[i]t is speech

on matters of public concern that is at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) (plurality opinion) (citations and internal quotation marks omitted); *see Snyder*, 562 U.S. at 451-52.

**1.**

Undisputed facts of record and relevant case authority, including a decision of our own, teach us that Mr. Armstrong was a public official at the time in question. He was an Assistant Special Agent in Charge (ASAC) at TIGTA, supervising five to seven employees. As an ASAC, he was responsible for managing a group of Special Agents investigating mainly fraud involving Internal Revenue Service procurements. His unit presented the results of its investigations either to an "adjudicator" or to the United States Attorney's Office if possible criminal prosecution was warranted. His duties required him to carry a firearm and federal law enforcement credentials, and gave him access to sensitive databases and information. In TIGTA's own description, which Mr. Armstrong does not question, he occupied "a position of heightened public trust and responsibility" as a "[f]ederal law enforcement officer," and "[a]s an ASAC [was] held to a higher standard of conduct than non-supervisory employees . . . ."

Whether Mr. Armstrong was a public official "is a question of law to be resolved by the court." *Moss v. Stockard*, 580 A.2d 1011, 1029 (D.C. 1990). Although the term "'public official' cannot 'be thought to include all public employees,'" *id.* (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979)), the designation "applies *at the very least* to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) (emphasis added). Lower courts have consistently held that this standard fits the responsibility of law enforcement officers, particularly those with supervisory authority. This court is among them. In *Beeton v. District of Columbia*, 779 A.2d 918 (2001), we considered whether the plaintiff/appellant, a correctional officer at the District's then-prison facility in Lorton, Virginia, was a public official "at the time the [alleged] defamatory article [about her] appeared." *Id.* at 920. In holding that she was, we pointed out that Ms. Beeton was commonly addressed as "Corporal" and had recently been "named the Officer in Charge . . . of the Facility's Control Center," *id.*, and we relied on "several cases from other jurisdictions holding that law enforcement officers are public officials." *Id*. at 924. We found particularly instructive *St. Amant v. Thompson*, 390 U.S. 727 (1968), in which, we said, "the Supreme Court [had]

concluded that a deputy sheriff was a public official and had the burden of proving that the statements about his official conduct were made with actual malice." *Id.* Although Mr. Armstrong points out that in *St. Amant* the Supreme Court actually accepted, "[f]or purposes of this case" and without further discussion, the state court's finding that the plaintiff was a public official, *see* 390 U.S. at 730, that discrepancy is of no moment: *Beeton*'s holding that a law enforcement officer, at least one clothed with supervisory authority as Ms. Beeton was, is a public official is unmistakable.

Many courts have gone further and held that, because "[l]aw enforcement is a uniquely governmental affair," an officer "of law enforcement, from ordinary patrolman to Chief of Police, is a 'public official' within the meaning of federal constitutional law." *Roche v. Egan*, 433 A.2d 757, 762 (Me. 1981) (collecting cases).[6]  Here it is enough for us to conclude that Mr. Armstrong, a supervisory

---

[6] *See also Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1429-31 (8th Cir. 1989) (FBI Special Agent a public official); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (law enforcement officials "have uniformly been treated as public officials within the meaning of *New York Times*"); *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 88 (1st Cir. 2002) (police officers are public officials); *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288-89 & n.5 (collecting cases) (Mass. 2000) (police officers are public officials for purposes of defamation suit); *Rattray v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir. 1994) (citing cases); *Hildebrant v. Meredith Corp.*, No. 13-CV-13972, 2014 WL 5420787, at *10 (E.D. Mich. Oct. 23, 2014) (law enforcement officers are public officials for purposes of
(continued…)

special agent in TIGTA investigating potential criminal fraud, with access to confidential databases and occupying what TIGTA itself considered "a position of heightened public trust and responsibility," was a public figure within the First Amendment when Ms. Thompson made her statements.

**2.**

Ms. Thompson's statements to USDA about Mr. Armstrong also "relate[d] to his official conduct." *New York Times*, 376 U.S. at 279-80. "[T]hat limitation," one Circuit Court has stated, "has been broadly construed to reach 'anything which might touch on . . . [the] official's fitness for office.'" *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 88 (1st Cir. 2007) (quoting *Garrison*, 379 U.S. at 77). And, as the Supreme Court stated in *Garrison*, "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." 379 U.S. at 76. Ms. Thompson's letters to USDA, as we explained in *Armstrong I*,

_____

(…continued)

defamation, regardless of whether they set department policy); *Young v. Gannett Satellite Info. Network, Inc.*, 837 F. Supp. 2d 758, 763 (S.D. Ohio 2011) ("[A]s a police officer, Young is a public figure for purposes of his defamation claim.").

80 A.3d at 185-88, concerned a TIGTA investigation of Mr. Armstrong for allegedly gaining unauthorized access to and improperly using information from TIGTA databases. For instance, what Mr. Armstrong "contends . . . [was] the most damning claim in Ms. Thompson's letters" was that USDA was offering Mr. Armstrong employment at roughly the same time he "was under internal investigation by his own agency for suspected violations of both a criminal and investigative nature." *Id.* at 185. These statements undeniably related to Mr. Armstrong's fitness to hold another law enforcement position similar to that he occupied at TIGTA.

It is also apparent to us that Ms. Thompson's statements to USDA involved not just Mr. Armstrong as an individual, but matters of "public concern." *Dun & Bradstreet*, 472 U.S. at 758-59. At least as applied to a supervisory law enforcement official, we agree that "the ethics of a government employee and thus his fitness for office" are "quintessentially [a matter] of public concern." *Lewis v. Elliott*, 628 F. Supp. 512, 521 (D.D.C. 1986); *see Ayala v. Washington*, 679 A.2d 1057, 1067 (D.C. 1996) ("speech [that] concerns the conduct of government . . . [is] properly treated as of 'public concern'"). Mr. Armstrong counters that Ms. Thompson's letters were essentially the act of a disgruntled employee masquerading as good-citizen whistleblowing; he cites for this the remarks of

judges in earlier related federal litigation that she was acting out of "personal motives" or, "as far as anybody can tell, out of some sort of vendetta."[7] But because no question of the First Amendment was before these judges, they had no reason to be mindful of the "breathing space" it affords speech about the fitness of public officials, even if motivated by "ill-will." *Garrison*, 379 U.S. at 73-74. The parties dispute Ms. Thompson's motives for reporting Mr. Armstrong's embroilment to USDA, but ultimately they are beside the point.[8] Judge Epstein, while also not deciding First Amendment issues, correctly saw the matter of public concern reflected in society's interest "in encouraging disclosure of" substantially true information "to a federal agency regarding a prospective employee's prior misconduct that is directly related to his fitness for the potential position."

It remains for us to reject Mr. Armstrong's reliance on *Connick v. Myers*, 461 U.S. 138 (1983). There the speech at issue was an internal office questionnaire that sought answers from co-employees about things like "office morale" and "the level of confidence in supervisors." *Id.* at 141. "[I]f released to

---

[7] *See Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011).

[8] Also beside the point is whether, as Mr. Armstrong contended at oral argument, USDA was already aware of the information concerning the TIGTA investigation through Mr. Armstrong and TIGTA's own disclosures. This has no effect on whether Ms. Thompson's disclosures are protected by the First Amendment.

the public," the Supreme Court held, the questionnaire and answers "would convey no information . . . other than the fact that a single employee [who circulated it] is upset with the status quo." *Id.* at 148. By contrast, Ms. Thompson's letters — in *Connick*'s distinguishing words — sought to inform USDA of "actual or potential wrongdoing or breach of public trust" by a supervisory official, *id.*, a disclosure "touching upon a matter of public concern." *Id.* at 147.

**3.**

For these reasons, to avoid summary judgment Mr. Armstrong had to show that triable issues of fact existed as to Ms. Thompson's actual malice in sending the letters. *See Nader v. de Toledano*, 408 A.2d 31, 50 (D.C. 1979) ("The question to be resolved at summary judgment is whether plaintiff's proof is sufficient such that a reasonable juror could find malice with convincing clarity . . . ."). In light of our decision in *Armstrong I, supra*, he could not do so. The assertions of fact in Ms. Thompson's letters, we held, were substantially true as a matter of law, 80 A.3d at 185, and the Supreme Court has "long held . . . that actual malice entails falsity." *Air Wisconsin Airlines v. Hoeper*, 134 S. Ct. 852, 861 (2014). For the rest, the letters consisted of expressions of opinion that we concluded "were unverifiable and therefore not actionable in defamation." *Id.* at 187. The Supreme Court

similarly held in *Milkovich v Lorain Journal Co.*, 479 U.S. 1 (1990), that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20. In sum, as a matter of law under the First Amendment, none of the statements in Ms. Thompson's letters provided a basis for liability.

**D.**

Accordingly, we must reverse the judgment entered for Mr. Armstrong and remand with directions for the trial court to enter judgment in favor of Ms. Thompson.

*So ordered*.